NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240996-U

NO. 4-24-0996

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 31, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| ADRIAN B. ISOM GREGORY, | ) | No. 21CF169 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John P. Vespa, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*:   (1) Issues not raised below are procedurally forfeited.

(2) To preserve an issue for review on appeal, a defendant must object at trial and raise the issue in a written posttrial motion.

(3) Under the first prong of the plain-error doctrine, unless there was a clear or obvious error that, because of the closely balanced nature of the evidence, might have affected the outcome of the case, the procedural forfeiture of the error must be honored.

(4) Because prejudice for purposes of the first prong of the plain-error doctrine is comparable to prejudice for purposes of a claim of ineffective assistance of counsel—*i.e.*, a reasonable probability that, but for the error, the outcome of the case might have been more favorable to the defense—failure to establish prejudice for purposes of the plain-error doctrine amounts to failure to establish prejudice for purposes of ineffective assistance.

(5) A jury is presumed to have followed the circuit court's instruction to disregard a witness's answer after the court sustained an evidentiary objection.

(6) If the content of a proposed nonpattern jury instruction can already be developed, by corollary, from the pattern jury instructions, it is not an abuse of discretion by the circuit court to reject the proposed nonpattern jury instruction as argumentative and unnecessary.

(7) When all the evidence in this case is viewed in the light most favorable to the prosecution, a rational jury could find, beyond a reasonable doubt, the element of recklessness in the definition of reckless homicide and the element of willful and wanton disregard in the definition of aggravated reckless driving.

(8) If a defendant is found guilty of a Class 3 felony and a Class 4 felony, an extended prison term may be imposed only for the greater class of offense.

(9) To preserve a sentencing issue for review, the defendant must (a) make a contemporaneous objection and (b) raise the issue in a written postsentencing motion, and the procedural forfeiture resulting from the omission of (a) or (b) can be averted only through the plain-error doctrine.

¶ 2        In the Peoria County circuit court, a jury found defendant, Adrian B. Isom Gregory, guilty of reckless homicide in the death of Aries Terrell (720 ILCS 5/9-3(a) (West 2020)) and aggravated reckless driving in the infliction of great bodily harm upon Linda Kluber (625 ILCS 5/11-503(a)(1) (West 2020)). For those offenses, the court sentenced him to the maximum extended terms of imprisonment, ordering that the terms run concurrently. Defendant appeals, contending that the court committed a variety of errors before trial, at trial, and in sentencing.

¶ 3        We find all but one of defendant's contentions of error to be either procedurally forfeited or unmeritorious. The lone exception is the statutorily unauthorized imposition of an extended prison term for the lesser class of offense, aggravated reckless driving. We vacate the six-year term of imprisonment for aggravated reckless driving and substitute the maximum nonextended term of three years' imprisonment. Otherwise, we affirm the circuit court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5                              A. Defendant's Motions for Discovery

¶ 6            On November 2, 2023, in a motion for discovery, defense counsel requested that the circuit court order the State to provide the defense the following documents:

> "1. Any medical records, letters from medical personnel, or documents of regarding [*sic*] any medical condition of Linda Kluber such as heart or visual or brain that could impair her ability to drive.
>
> 2. Any records of any car accidents or insurance claims from car accidents where Linda Kluber was driving within eighteen (18) prior to November 20, 2020.
>
> 3. Driving record of Linda Kluber prior to November 20, 2020."

¶ 7            On November 27, 2023, there was a hearing on this motion for discovery. Defense counsel explained he was seeking the documents because one of the elements the State would have to prove at trial was proximate cause and the defense had "a right to inquire" how Kluber's "driving actions may have played in the case." Kluber's "driving record," defense counsel argued, and "any type of health issues that she may have had on the date of the accident" were "relevant to the case." Because defense counsel did not have Kluber's "health providers' information," which was "private information," he was unable to "subpoena that directly"—he did not know what health providers upon which to serve a subpoena.

¶ 8            For three reasons, the prosecutor objected to defense counsel's discovery request. First, the prosecutor argued that, under the Health Insurance Portability and Accountability Act of 1996 (Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended in scattered sections of Titles 18, 26, 29, and 42 of the United States Code), the defense had no right to Kluber's medical records. Second, Kluber was a victim and was not ticketed, whereas defendant "was

driving over 90 miles an hour on Reservoir [Boulevard]." Third, this case was a criminal case, not a civil case in which contributory negligence could be raised.

¶ 9        Even so, defense counsel responded, fault was at issue in this criminal case just as it could have been at issue in a civil case. Whether the speed at which defendant drove was "the reason for the accident [would be] an issue for the jury to decide" "based on the facts," defense counsel argued, not based on whether Kluber received a ticket. Those facts, defense counsel insisted, should include Kluber's medical records. Defense counsel pointed out that he was "not asking for [her] overall medical records"; he was asking for only those records pertaining to "any medical condition that would affect her driving ability." He had a good faith basis, he assured the circuit court, for believing that Kluber might have been medically unfit to drive: a conversation between Kluber's husband and defendant's family in which Kluber's husband "stated that [Kluber] wasn't supposed to be driving and[ ] [in which he] alluded to some health issues."

¶ 10        The same day of the hearing on defendant's motion for discovery, after taking the matter under advisement, the circuit court entered an order denying the motion.

¶ 11        On March 4, 2024, after reviewing a video from Peoria police officer Jared Moore's body-worn camera in which Moore mentioned that he recognized Kluber from a previous accident, defense counsel filed a second motion for discovery. This motion requested that the State produce to the defense the following records:

> "1. Any medical records, letters from medical personnel, or documents of regarding [*sic*] any medical condition of Linda Kluber such as heart or visual or brain that could impair her ability to drive.
>
> 2. Any records of the car accident involving Linda Kluber that Where [*sic*] Officer Moore was one of the reporting officers. Officer Moore mentioned the

accident on his body camera. He mentioned recognizing Ms. Kluber from a prior accident."

¶ 12 On March 7, 2024, at a hearing on this second motion for discovery, defense counsel noted that there was a witness who, in his statement to the police, contradicted Kluber's statement that she was driving down West Reservoir Boulevard when defendant's oncoming vehicle entered her lane and struck her vehicle head-on. According to defense counsel, this witness claimed he was driving behind Kluber when Kluber turned onto West Reservoir Boulevard from North Rochelle Lane, which had a stop sign, and that the collision happened when Kluber made the turn. The question, then, defense counsel suggested, was whether the accident resulted from defendant's excessive speed or whether, alternatively, it resulted from "a driver who didn't stop at a stop sign or didn't look both ways before she pulled out from the stop sign." Defense counsel continued:

> "Either way the issue of her previous driving record, if she has been in accidents before, it could be indicative of an individual who may be, for whatever reason, it could be a health reason, it could be just, you know, distracted or whatever, has not paid close enough attention to driving conditions."

¶ 13 The circuit court gave the defense permission to serve upon the Peoria Police Department a subpoena *duces tecum* for any report of a previous accident in which Kluber was involved. The court disagreed, however, that the prosecutor had a discovery obligation to obtain such a police report and provide it to the defense. Therefore, the court denied the demand that the State produce to the defense the documents listed in the second motion for discovery.

¶ 14 B. Defendant's Motion *in Limine*

¶ 15 On March 6, 2024, the defense filed a motion *in limine*, in which he made two

requests.

¶ 16　　　　The first request was that, at trial, the circuit court bar the admission of a crash reconstruction report by the Illinois State Police. According to defense counsel, an illustration in this report insinuated that defendant was responsible for the accident. Defense counsel argued that this insinuation was unfair because (according to defense counsel) it was based solely on the statement that Kluber had made to the police, a statement contradicted by another witness, Dewand Howard.

¶ 17　　　　Another reason for the unfairness, defense counsel argued, was that although the police had "retrieved the Airbag Control Module from the vehicle the Defendant was driving *** and included [data from that module] in the report," Kluber had refused access to the airbag control module in her vehicle and the police had not requested a search warrant to obtain that module. (On the other hand, defendant's discovery motion asserted that "the illustration [was] not based on the data from the [air control module] of *either* the Defendant's vehicle or Mrs. Kluber's vehicle." (Emphasis added.)) Because of those asserted shortcomings, defendant claimed that the probative value of the crash reconstruction report was substantially outweighed by the danger of unfair prejudice and that the report, therefore, was inadmissible under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011).

¶ 18　　　　The second request in defendant's motion *in limine* was that, at trial, the circuit court give a nonpattern jury instruction that speed alone was insufficient to prove reckless homicide.

¶ 19　　　　On March 11, 2024, immediately before *voir dire*, the circuit court held a hearing on the motion *in limine*. At the hearing, the prosecutor stated that the police had, in fact, obtained a search warrant for the airbag control module in Kluber's car and that the police had retrieved

- 6 -

that module. Defense counsel said he had been unaware of those facts. Nevertheless, he did not withdraw his request to bar the accident reconstruction report. The court ruled that if a foundation were laid and if the crash reconstruction expert had sufficient credentials, the expert could "testify as to what he concluded and why." On the remaining question of the nonpattern jury instruction, the court reserved ruling until the jury instruction conference.

¶ 20                                    C. The Jury Trial

¶ 21                                    1. *Pretrial Admonitions*

¶ 22          Also on March 11, 2024, before *voir dire*, the circuit court inquired of the attorneys, "Count I is punishable by what?" The prosecutor answered, "[T]wo to five years in the department of corrections. It is probationable, not extendable on count 1." The court asked, "Two to five years, day-for-day?" Both attorneys agreed that this was the sentencing range for count I.

¶ 23          The circuit court asked if the sentencing range on count II was one to three years' imprisonment. The prosecutor responded, "He is extendable on this count, Judge, and I did file a notice of intent and sent that to [Defense Counsel] Beals a couple weeks ago notifying him that I would be seeking an extended term. [Defendant] is extended term eligible because [Kluber is] above the age of 60." Defense counsel said that "it's a discretion if he's extendable."

¶ 24                                    2. *Kluber*

¶ 25          Kluber testified that she was 73 years old, that she was 69 years old on the date of the accident, and that for the past 43 years she had lived on North Sandia Drive in Peoria, a street that intersected West Reservoir Boulevard. On November 20, 2020, she had just returned home from shopping at Kroger when it occurred to her that she wanted Diet Coke and chocolate candy, which she had not picked up from Kroger. She decided she would buy those additional items at Walgreens on North Sterling Avenue, which intersected West Reservoir Boulevard several

blocks east of North Sandia Drive. So, without unpacking the groceries from the trunk of her Chevrolet Impala (Impala), she pulled out of her driveway and onto North Sandia Drive. Then, from North Sandia Drive, she turned right, or east, onto West Reservoir Boulevard and headed toward North Sterling Avenue.

¶ 26　　　　There were several intersections on West Reservoir Boulevard between North Sandia Drive and North Sterling Avenue, including North Rochelle Lane. Kluber denied that on September 20, 2020, she turned from North Rochelle Lane onto West Reservoir Boulevard—or that she ever drove on North Rochelle Lane. Instead, according to her testimony, she merely turned from North Sandia Drive east onto West Reservoir Boulevard and drove east toward Walgreens, which was at the intersection of North Sterling Avenue and West Reservoir Boulevard.

¶ 27　　　　West Reservoir Boulevard, Kluber explained, had three lanes: an eastbound lane, a middle turn lane, and a westbound lane. (Kluber, other witnesses, and the attorneys called West Reservoir Boulevard simply "Reservoir," as they called North Sandia Drive "Sandia," North Rochelle Lane "Rochelle," and North Sterling Avenue "Sterling.") Kluber testified that she was traveling in the eastbound lane of West Reservoir Boulevard and was almost at the intersection with North Rochelle Lane when she saw, on the other side of the intersection, a vehicle approaching rapidly in the westbound lane of West Reservoir Boulevard and weaving back and forth in that lane. This was the vehicle that defendant was driving. Uncertain what this approaching vehicle would do, Kluber took her foot off the gas (so she testified). This oncoming vehicle proceeded through the intersection and entered the middle lane, the turn lane, of West Reservoir Boulevard. Then, in the middle lane, this vehicle swerved further to the left, toward Kluber, who was still in the eastbound lane of West Reservoir Boulevard. (At first, in her

testimony, Kluber said that this oncoming vehicle "turned" left, but she clarified that by "turned" she meant "swerved.") Perceiving that this vehicle would hit her head-on unless she took evasive action, she turned her steering wheel to the left. However, she underestimated the speed at which the oncoming vehicle was traveling, and she was unable to get out of the way in time. The vehicle that defendant was driving struck her vehicle head-on in the middle lane of West Reservoir Boulevard. She blacked out. When she regained consciousness, her vehicle was still in the eastbound lane of West Reservoir Boulevard, but her vehicle had spun around and was now facing west in the eastbound lane. Defendant's vehicle was lying on its side in the grass alongside the eastbound lane.

¶ 28 In the crash, Kluber sustained four broken ribs, two of which pierced her lungs. Her lower left leg was fractured, and her right ankle was seriously injured to the extent that broken bones were protruding from it. She suffered trauma to her kidneys and anemia from blood loss. Her ankle had to be surgically repaired with a metal implant. She had to undergo physical therapy. It was 18 months before she was able to do 90% of the things that she used to do. She still had to be careful with her ankle.

¶ 29 On cross-examination, defense counsel asked Kluber if she was sure she was not making a left turn off North Rochelle Lane when the accident happened. "No way," she answered. She stated, "I don't travel on Rochelle." She denied pulling out of North Rochelle Lane in front of defendant. "No," she testified, "I was [on] Reservoir the whole way from when I got home to when I was driving out. No—all Reservoir."

¶ 30 Next, defense counsel asked Kluber if, in 2020, she had any medical condition that would have affected her ability to drive. She answered no. She likewise answered no when defense counsel asked if she had been under the influence of any drugs.

¶ 31    Defense counsel also asked Kluber if she was in an accident before November 20, 2020. She answered, "I was in an accident probably six months before that, but it wasn't my fault. The lady got a ticket. And what she did is she went over two lanes, didn't see me as I was coming up there, and hit me. She got a ticket."

¶ 32                                3. *Terrell's Cause of Death*

¶ 33    In the collision, Terrell, a front seat passenger, was ejected from a Kia Sorento SUV (Kia). A forensic pathologist, Dr. Amanda Youmans, performed an autopsy on Terrell's body. In her testimony, Dr. Youmans described Terrell's injuries and opined that Terrell had died from multiple blunt force traumas.

¶ 34                                4. *Roofers and a Nurse*

¶ 35    Matthew Gale was working on a roof two houses away from the intersection of North Rochelle Lane and West Reservoir Boulevard when he heard a car speeding, prompting him to turn around. After turning back toward his work, he heard "cars smashing together." He did not see the collision happen. He walked to the accident site and helped defendant, who had a broken leg. Defendant was screaming, bleeding, in pain, and smelled of alcohol.

¶ 36    Another roofer, Chester Harris, was taking materials off a trailer near the intersection of North Rochelle Lane and West Reservoir Boulevard when, from a couple blocks away, he heard a motor "going real fast." He turned around and saw a car traveling down the middle lane, the turn lane, of West Reservoir Boulevard. Then he heard, but did not see, the collision. He watched as other members of the roofing crew helped the driver exit the vehicle through the windshield.

¶ 37    Michelle Burger, a nurse, was in a parking lot when she "heard a noise that sounded like a crash." She drove toward where the noise seemed to have originated and pulled

over at the site of an accident. CPR was being performed to the left of her, and a man was trying to get out of an overturned van. She testified, "When I helped him get out of the vehicle, he grabbed me and I was trying to have him stand up, and I could smell the strong smell of alcohol on his breath, and I just heard him say over and over, [']I need to get out of here.['] "

¶ 38                                    5. *Paul Kuhn*

¶ 39        Without objection by the defense, Sergeant Paul Kuhn of the Illinois State Police was certified as an expert in traffic crash reconstruction. He testified that on November 25, 2020, Officer Moore of the Peoria Police Department contacted him about "imag[ing] an airbag control module" from a Kia. Kia Corporation "ha[d] its own stand-alone equipment to be able to image an airbag control module" from a Kia vehicle, and it was "really expensive, pricey equipment." The Peoria Police Department lacked this special equipment from Kia Corporation, but the Illinois State Police had the equipment. So, Moore brought Kuhn the "black box," or airbag control module, from the Kia, and Kuhn used "the Kia [event data recorder] [on [his] computer" to "image[ ] the data that [was] contained within that module" and to set forth the data in "a PDF format." The computer program, rather than Kuhn, "actually generate[d] the whole report," and Kuhn sent the report to Moore after merely glancing over it.

¶ 40        Kuhn testified that data in the airbag control module could include "[the] speed of the vehicle, *** deployment data for the airbags, seatbelt usage, braking, the RPMs of the vehicle, what kind of changes in velocity, lateral, longitudinal the vehicle experienced in the crash." The data also might include the steering input (the angle at which the steering wheel was turned), stability control (the activation of the antilock braking system), and the use of the throttle (the percentage by which the throttle was open: 0% signifying no pressure on the gas pedal and 100% signifying that the gas pedal was pressed to the floor).

¶ 41 Kuhn explained that most vehicle manufacturers designed their airbag control modules to be triggered by a sudden slowdown of the vehicle by five miles per hour, whereupon the module began recording data picked up by sensors inside the vehicle. Consequently, when airbags were deployed, data was almost certainly being recorded. Most manufacturers, including Kia Corporation, had set their airbag control modules to begin recording "five seconds before the event," yielding "up to five seconds of precrash data."

¶ 42                                6. *Michael Bishoff*

¶ 43 Michael Bishoff testified that since March 2012, he had been a police officer for the Peoria Police Department, and that since 2018, he had been assigned to its traffic division. One of his duties in the traffic division was to investigate crashes in which serious injury was sustained.

¶ 44 He had undergone training in accident reconstruction. In 2019, he took Crash Investigation I and II at Northwestern University, and in 2020, he took a course on crash reconstruction.

¶ 45 Whenever there was a vehicular collision in Peoria resulting in death or great bodily injury, Bishoff and his colleague, Moore, were dispatched to the scene. On November 20, 2020, at approximately 10:30 a.m., Bishoff went to a collision at the intersection of West Reservoir Boulevard and North Rochelle Lane. He noted, upon arrival, that the posted speed limit on West Reservoir Boulevard was 35 miles per hour. The driver of a 2009 silver Impala was still in her vehicle, and he spoke with her before she was removed from the vehicle and taken to the hospital.

¶ 46 Another police officer, Haley Hergenrother, took photographs of the scene of the accident. In his testimony, Bishoff described the photographs as they were shown to the jury.

¶ 47        These photographs are in the record. People's exhibit No. 6 appears to have been taken in the westbound lane of West Reservoir Boulevard, with the photographer facing west, toward the intersection with North Rochelle Lane. Bishoff pointed out that, in the center of this photograph, in about the middle of the westbound lane, a black tire mark began and arced to the left, toward the eastbound lane of West Reservoir Boulevard. People's exhibit Nos. 7 and 8 were progressively closer views of the intersection: evidently, the photographer, still in the westbound lane, had walked west, closer and closer to the intersection with North Rochelle Lane, while taking these photographs. The black arcing tire mark becomes more visible in these photographs, curving from the westbound lane into the intersection and into the middle lane (if the middle lane were visualized as continuing through the intersection) and ending at the center west side of the intersection. This arcing tire mark—this "yaw mark" as Bishoff called it—ended at the spot of "maximum engagement," about where the collision happened: on West Reservoir Boulevard, at the center-west side of the intersection with North Rochelle Lane.

¶ 48        "You can see the tire mark into where the collision would've [been]," Bishoff observed, referring to People's exhibit No. 9. The prosecutor asked Bishoff whether he "[knew] what tire that would have been or what side of the car that would have been." Defense counsel objected, arguing that Bishoff had not "been tendered as an expert" and that "he would be speculating." The circuit court overruled the objection, and Bishoff answered, "I'm not sure."

¶ 49        People's exhibit No. 12, Bishoff observed, showed the gouges in the blacktop where the fronts of the vehicles had crumpled down onto the street in the frontal collision. These white gouges appear to be, as Bishoff testified, at the center-west side of the intersection. More precisely, judging from the photographs, these gouge marks are at about the left side of the middle lane, at the center-west side of the intersection, from the perspective of someone facing

- 13 -

west.

¶ 50 Several of the photographs that Hergenrother took show the Kia lying on its driver's side on the grass adjacent to and south of the eastbound lane of West Reservoir Boulevard. The Impala is in the eastbound lane—about 20 feet west of the intersection, by Bishoff's estimate—but the Impala is facing west in the eastbound lane. According to Bishoff's testimony, the head-on collision hurled the Impala about 20 feet back, out of the intersection, while causing it to rotate so that, upon coming to rest, it faced west instead of east.

¶ 51 In addition to pointing out those aspects of the photographs, Bishoff described what was pictured in surveillance videos from Sterling Towers and Sterling Plaza as the videos were played for the jury. Those buildings were not close enough to the intersection to show the collision, but they showed the Kia going west on West Reservoir Boulevard and illegally using the middle lane to pass a vehicle. Bishoff further noted that, in one of the videos, there was "a bus station with people waiting to get on a bus over there."

¶ 52 With reference to the surveillance videos, the prosecutor asked Bishoff, "Had you done any comparisons in your own vehicle as far as measuring how many frames your car going 35 miles an hour would appear in a video as compared to how many frames the Kia Sorento did?" Defense counsel objected because "[i]t sounds like we're getting into expert testimony." The circuit court overruled the objection, and Bishoff answered that he had done no such comparisons.

¶ 53 After the foregoing direct examination of Bishoff by the prosecutor, the circuit court requested that Bishoff explain what he meant by the term "yaw." The court was concerned that because it was confused by that term, members of the jury might be confused, too. Bishoff explained that, by a "yaw mark," he meant the tire was "sliding and causing an arcing pattern"

from the car's "going so fast [it was] not obeying the tire." In other words, even though the tire was facing one way, the tire was sliding and going the other way because the car was "going so fast [it was] overcoming where the tire want[ed] to go."

¶ 54          On cross-examination, Bishoff agreed that a car could leave a yaw mark while its brakes were being applied. He testified, however, that a driver need not apply the brakes to make a yaw mark. Merely by looking at the pavement as shown in the photographs, Bishoff testified, he could not tell whether the driver was braking as the tire made the arcing yaw mark to the left. Bishoff agreed with defense counsel that, to determine whether the driver was braking as the car was yawing, Bishoff would need data from the car's airbag control module.

¶ 55                                         7. *Moore*

¶ 56          Moore testified he was a Peoria police officer who, since 2013, had been assigned to the police department's traffic investigation unit. His responsibilities were crash investigations, driving under the influence investigations, and traffic enforcement.

¶ 57          In 2013, at Northwestern University, Moore took classes on crash investigation: "crash 1, crash 2, and vehicle dynamics." In 2022, to become a crash reconstructionist, he took more classes. At the time of the incident in the present case, Moore was a crash investigator and was, as he put it, "certified in things such as crash data retrieval."

¶ 58          Specifically, Moore was trained in the use of the "Bosch System," technology designed by Bosch Corporation to "access data from a vehicle's airbag control module." The module, Moore explained, was "not always recording data, but when the module sense[d] a vehicle's involvement in a crash," it could "store data and information prior to, during, and possibly even after a crash."

¶ 59          On November 20, 2020, just after 10:30 a.m., Moore went to the scene of a two-

- 15 -

vehicle collision at the intersection of West Reservoir Boulevard and North Rochelle Lane. He saw the two vehicles involved in the collision and spoke with their drivers. Defendant, who was in great pain from a broken leg, "[s]tated when they were going down the road, that the other car came off of—from the side and they crashed, and he wasn't sure of much else."

¶ 60      Moore also spoke with Clarence Capps, who had been working nearby on a roof when the accident happened. According to Moore's testimony, Capps stated to Moore that "the SUV was traveling westbound on Reservoir at a very high rate of speed in the center lane." (At trial, however, Capps testified that he never saw the vehicle, that he could not remember what he had told the police, and that he must have told the police merely what he had heard from other members of the roofing crew.)

¶ 61      After finishing his investigation at the scene of the crash, Moore had the Kia and the Impala towed to the garage of the Peoria Police Department, where more photographs were taken. One photograph was of a bottle of tequila that was found under the driver's seat of the Kia. The liquid in the bottle field tested positive for alcohol.

¶ 62      Mechanics removed the air control modules from the Chevrolet and the Kia. Using the Bosch crash data retrieval system, Moore "did an image on the vehicle airbag control module" from the Chevrolet. He hooked the module to a can (the "blue box that reads the information off the module"), "plug[ged] that into a laptop *** at the police department," "activate[d] the software, entered [his identifying] information, *** [the] case number, the [vehicle identification] number of the vehicle that [he was] imaging," and "hit the button to image that information." The "software and system then extract[ed] data off of that module and provide[d] it to [Moore] in a report." Because Moore was, he testified, "certified or an expert in the area of crash data retrieval," he knew how to interpret the report the computer had generated.

¶ 63    Moore explained that the airbag control module in the Impala recorded "two and a half seconds of information of what the vehicle was doing prior to what's called the event," *i.e.*, the crash, when the airbags were deployed. (But, unlike the airbag control module from a Kia, the module from the Impala did not record the steering wheel's position.) At 2½ seconds before the crash, according to the report, the Impala was traveling 21 miles per hour, the engine throttle was at 18%, and the brake switch was on, meaning that, in addition to having her foot on the gas pedal, Kluber had her foot on the brake. At two seconds, the Impala was traveling 19 miles per hour, the throttle was still at 18%, and the brake switch was still activated. At 1½ seconds, the Impala was traveling 16 miles per hour, with the data otherwise unchanged. At one second, the Impala was traveling 14 miles per hour, with the data otherwise unchanged. At half a second before the crash, the Impala was traveling 13 miles per hour, with the data otherwise unchanged.

¶ 64    Because the Bosch system worked on only certain makes and models of vehicles and did not cover Kias, Moore took the airbag control module from the Kia and met with Kuhn at the Illinois State Police headquarters in La Salle, Illinois, where Kuhn used Kia equipment to image that module. Kuhn then e-mailed the report to Moore. Again "using [his crash data retrieval] training," Moore reviewed the Kia report.

¶ 65    Moore testified that the airbag control module from the Kia provided five seconds of precrash data. At five seconds, according to the report from Kuhn, the Kia was traveling 145 kilometers per hour (which Moore converted to 90 miles per hour), the throttle was at 96%, and the brake switch was not activated. The airbag control module from the Kia also recorded the steering wheel's position: at five seconds before the crash, the steering wheel's position was zero, meaning that the Kia was being driven straight. At 4½ seconds, there was no change in the data. At 3½ seconds, the data was still unchanged. At three seconds, the Kia sped up to 91 miles

per hour, but the throttle was still at 96%, with no brakes and no steering input. At 2½ seconds, there was no change. At two seconds, there still was no change. At 1½ seconds, the Kia sped up to 92 miles per hour, but the data was otherwise unchanged. At one second before the crash, the driver of the Kia took his foot off the gas but was not yet braking. At half a second before the crash, the Kia slowed to 90 miles per hour, the throttle was at 0%, the brake switch was activated (indicating that the driver was pressing on the brake pedal), and, in addition, there was a positive 60 degrees of steering input, meaning that the Kia was steered 60% to the left, from the westbound lane toward the eastbound lane of West Reservoir Boulevard. At zero seconds—the time of the event—the Kia was traveling 70 miles per hour, the brake switch was still activated, and there was a steering input of 70% to the left.

¶ 66        The prosecutor then asked Moore, "So, between the 91 or whatever it was at one second or—half a second and then the event, it's only going 73. Is that because you ran into a car?" Moore began to answer, "Yeah, I believe this because—," but he was interrupted by defense counsel's objection that this was "an opinion from someone who has not been tendered as an expert." The circuit court sustained the objection and instructed the jury to disregard Moore's answer.

¶ 67                            8. *Deward Wilson*

¶ 68        After the circuit court denied defendant's motion for a directed verdict, the defense called Deward Wilson, who testified substantially as follows.

¶ 69        On November 20, 2020, Wilson witnessed a car accident at West Reservoir Boulevard and North Rochelle Lane. (It does not appear that, in his testimony, Wilson specified exactly where he was or what he was doing when he witnessed the accident.) A silver car, the model of which Wilson could not recall, "was making a turn off of Rochelle onto Reservoir,"

and "a truck collided and smashed into it." There was a stop sign on North Rochelle Lane, at its intersection with West Reservoir Boulevard, and "the car pulled out from the stop sign onto Reservoir."

¶ 70    On cross-examination, there was the following exchange between the prosecutor and Wilson:

"Q. Mr. Wilson, do you recall when you had initially spoken with the officer, Officer Rashard, that you told him that you witnessed the two vehicles hit head-on but was unaware about who was at fault?

A. Yes, yes.

Q. You said that and due to the situation happening too quickly?

A. Yes.

Q. Do you recall telling him that one of the vehicles that was driving westbound on Reservoir was at a high rate of speed?

A. Yeah, yes, I did."

¶ 71    The prosecutor then posed a hypothetical to Wilson: If someone driving north on North Rochelle Lane wanted to go to North Sterling Avenue, would this person turn right or left? Wilson answered that "you make a right *** onto Reservoir" and "then you're going eastbound in the eastbound lanes [*sic*]." The prosecutor then asked Wilson, "So, this vehicle that you saw, did it make a right or a left?" Wilson answered, "It was—as it came out, it was attempting to make a turn and just happened so quick. So, I believe there were—I think one took a right turn or something like that." Wilson agreed that if the silver car had taken a right turn from North Rochelle Lane onto West Reservoir Boulevard, the silver car would have been "in the eastbound lane going towards Sterling."

¶ 72　　　　　The prosecutor then asked Wilson what "the SUV or the bigger car [did], the one that was speeding." Wilson answered, "It was trying to slam on the brakes, and that's when the car hit the truck—the other car slammed into the truck. Made the truck flip over." He remembered that the truck "flipped over a couple times" and that someone was ejected from it.

¶ 73　　　　　Later, however, on redirect examination, Wilson testified it was the truck that had "smashed into" the silver car as the driver of the truck was applying the brakes.

¶ 74　　　　　On re-cross-examination, the prosecutor asked Wilson, "Do you recall telling the officer that you weren't sure what happened because it happened too quickly?" He answered, "Mm-hmm, yes, I did."

¶ 75　　　　　　　　　　　9. *The Jury Instruction Conference*

¶ 76　　　　　At the jury instruction conference, defense counsel objected to the State's proposal that the circuit court use Illinois Pattern Jury Instructions, Criminal, Nos. 5.01 (approved Dec. 8, 2011) ("Recklessness—Wantonness"), 5.01B (approved Oct. 28, 2016) ("Knowledge—Willfulness"), 7.09 (approved Dec. 8, 2011) ("Definition of Reckless Homicide"), 7.10 (eff. Jan. 1, 2005) ("Issues in Reckless Homicide"), 23.31X (eff. July 1, 1995) ("Definition of Aggravated Reckless Driving"), and 23.32X (eff. July 1, 1995) ("Issues in Aggravated Reckless Driving") (hereinafter IPI Criminal Nos. 5.01, 5.01B, 7.09, 7.10, 23.32X). The basis of defense counsel's objection to these pattern jury instructions was not that they were inaccurate as far as they went but that they were incomplete. In fact, defense counsel said he would have no objection to these pattern jury instructions if they were supplemented by a nonpattern jury instruction reading as follows: "Driving in excess of the lawful speed limit alone will not support a finding that the conduct of the defendant was willful, wanton, or reckless in the absence of another factor or factors." The prosecutor, however, objected to the proposed

- 20 -

nonpattern jury instruction because (1) nonpattern jury instructions were "never favored" and (2) "this instruction might confuse the jury as it is overly broad and vague."

¶ 77　　　　　The circuit court overruled defense counsel's objection to the pattern jury instructions and rejected the nonpattern jury instruction. The court explained:

"That excessive speed alone is insufficient for a finding of reckless driving. I've never heard of that, and it goes against my thinking. I don't know why a guy driving, let's say 92 miles an hour in a 35, for instance, how that alone cannot amount to reckless driving. It stuns me that someone would make that claim."

The court took defense counsel's word for it that there were "appellate judges out there that do say that." The court, however, chose "to follow the case law that says, excessive speeding in and of itself is enough to find reckless driving."

¶ 78　　　　　　　　　　　10. *The Prosecutor's Closing Argument*

¶ 79　　　　　Twice in her closing argument, the prosecutor suggested that defendant had intended to cause Terrell's death. The first time, the prosecutor characterized Terrell's death as a "terrible tragedy," and then, on second thought, the prosecutor questioned the aptness of the word "tragedy." Without eliciting an objection by defense counsel, the prosecutor argued:

"Only tragedy doesn't seem like the right word. Tragedy implies that something was just an accident, and this was no accident. It was intentional and that's not a tragedy, that's a nightmare.

When defendant recklessly sped 90 plus miles [per hour] around Reservoir, a road where 35 is the speed limit, that's at least 55 miles per hour over the speed limit."

¶ 80　　　　　The second time the prosecutor suggested, in her closing argument, that defendant

had intentionally caused Terrell's death, she began by saying she was at a loss to understand why defendant was driving 90 miles per hour a half-second before the crash and why he tried to make a left turn at such a high speed. "He was just so reckless. *** And maybe it was all intentional," the prosecutor mused. The prosecutor continued in this vein but was interrupted by defense counsel's objection:

"Maybe he was trying to kill both him and Aries—

MR. BEALS: Objection, Your Honor.

MS. MCCAVIT:—but he only got half the job done."

The circuit court sustained the objection and instructed the jury to disregard the prosecutor's suggestion that "[i]t kind of looks like the defendant wanted to kill occupants of his own car."

¶ 81 On May 13, 2024, the second day of trial, the jury found defendant guilty of reckless homicide and aggravated reckless driving.

¶ 82 D. The Posttrial Motion

¶ 83 On April 10, 2024, defense counsel filed a motion for a new trial. The motion requested that the circuit court set aside the findings of guilt and grant defendant a new trial on the following grounds: (1) "insufficient evidence to prove guilt," (2) "denial of the motion for discovery," (3) "denial Non-IPI instruction for reckless," (4) "denial of motion to dismiss due to speedy trial violation," and (5) "improper remarks by state on closing arguments."

¶ 84 E. Sentencing

¶ 85 On May 15, 2024, the circuit court held a hearing on defendant's motion for a new trial. After the attorneys made brief arguments, the circuit court denied the motion.

¶ 86 The circuit court then convened a sentencing hearing. At the beginning of the sentencing hearing, the prosecutor noted that "the maximum possible sentence in this case is 11

years": 5 years' imprisonment for count I, reckless homicide, and an extended term of 6 years' imprisonment for count II, aggravated reckless driving. Because there were two victims—Terrell in count I and Kluber in count II—the prosecutor requested that the sentence on count II run consecutively to that on count I. Also, the prosecutor requested that the sentences on counts I and II run consecutively to the sentence that defendant was serving for a Class X felony of aggravated battery in an unrelated case, Peoria County case No. 20-CF-214—especially considering that defendant "was out on bond when this occurred."

¶ 87 Defense counsel disputed the legality of making the sentence on count II run consecutively to, instead of concurrently with, the sentence on count I. Because counts I and II were "a single course of conduct," the sentences on those two counts had to run concurrently, he argued. As for whether the sentences in this case should run consecutively to the sentence in the aggravated battery case, defense counsel said he would reserve argument for later at the sentencing hearing.

¶ 88 Taken by surprise that there was a disagreement regarding whether a sentence on count II could be made to run consecutively to a sentence on count I, the circuit court continued the sentencing hearing so that the attorneys could provide the court with case law on this question.

¶ 89 The sentencing hearing reconvened on June 6, 2024—now with the attorneys' shared understanding that the sentences on counts I and II would have to be concurrent.

¶ 90 The State then called Kluber, who testified to her injuries, surgeries, financial hardships, and other changes in her life resulting from the accident. Also, the State called five members of Terrell's family, who described Terrell's good qualities as a person and as a mother of her four children, accused defendant of intentionally killing Terrell, and urged the court to

impose upon him the maximum punishment.

¶ 91    The defense then called four of defendant's family members, who spoke highly of defendant, attested to his remorse, and pointed out that he had four children of his own for whom he was a "provider."

¶ 92    The attorneys then made their sentencing arguments. The prosecutor returned to her theme that "[t]his was not an accident," but rather, it "was an intentional act." The prosecutor observed that defendant "was driving 92 miles an hour down an imperfect, pockmarked road in a 35 mile an hour zone past a bus station with people out in the road at 10 o'clock in the morning." The prosecutor conceded that defendant "doesn't have the worst criminal record we've seen in here." Even so, the prosecutor pointed out that when defendant committed the offenses in this case, he was "out on bond for shooting somebody." Given that fact, the prosecutor commented, "You [might] think he would be walking on eggshells, not knowing if you're going to spend the rest of your life in prison." As it turned out, "[s]omehow they were able to cut a deal and he only got ten years," and he was "serving that time now." The prosecutor argued that "they deserve their own time" instead of having "their time to be encompassed into the time he's doing for somebody else." The prosecutor added that "[Kluber] deserves her own time."

¶ 93    In response, defense counsel began with count II. He objected that an extended prison sentence on count II would violate *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because "what would be used in order to ask for enhancement was not actually an element of the crime." As for count I, he argued that an extended sentence on that count would be a double enhancement because the aggravating factor on which the enhancement would be based— speed—was already the basis of the conviction on count I.

¶ 94    Although defense counsel conceded that the circuit court had discretion to make

the sentences in the present case run consecutively to the sentence in the unrelated case, defense counsel contended that consecutiveness was unnecessary for the protection of the public, considering that defendant already was serving a 10-year prison sentence in the aggravated battery case and that, consequently, it would be long time before he would be driving again. Because the offense in the present case was unintentional, defense counsel requested that the sentences in the present case be made to run concurrently with the sentence in the aggravated battery case. Alternatively, he requested that the sentence on count I be no more than five years' imprisonment.

¶ 95 The circuit court asked defense counsel to address defendant's potential for rehabilitation. Defense counsel responded that defendant had such potential, as evidenced by the support he had from his family and his having been in the Peoria County Jail for over three years without any disciplinary incidents.

¶ 96 Defendant then made a statement in allocution, in which he assured the circuit court that the collision was accidental rather than intentional, professed his love for Terrell, accepted full responsibility for his actions, and apologized to Terrell's family and to Kluber.

¶ 97 After defendant made his statement in allocution, the circuit court noted that, according to the presentence investigation report, defendant told the probation officer that he was wrong for driving so fast but that the accident would not have happened if the car had not pulled out in front of him. The court remarked that defendant's present acceptance of full responsibility, in his statement in allocution, contrasted markedly with what he had told the probation officer and that "[a]ccepting [responsibility] now is too late."

¶ 98 The circuit court then listed the information it had considered on the question of the sentences that defendant should receive for reckless homicide and aggravated reckless

driving:

> "I've considered the presentence investigation report, the evidence presented, the arguments, the statement of allocution, the financial impact of incarceration, the statutory matters in mitigation and aggravation, which I'll specify in a second, the history and character of the defendant, the defendant's education, job history, statements on his behalf, the defendant's potential for rehabilitation and having due regard for the circumstances and nature of the offense."

¶ 99 The circuit court concluded that none of the statutory factors in mitigation were applicable to defendant's case.

¶ 100 The circuit court found, however, that the following statutory factors in aggravation were applicable: "[T]he defendant has a history of criminal activity. He's got three prior felonies. The sentence is necessary to deter others from committing the same crime."

¶ 101 The circuit court remarked that "[o]ne of the worst parts of this is that the defendant was not drunk or high": it apparently was just defendant being himself. The court said it had no doubt that the collision was, as defendant insisted, an accident, but the court was offended by his excuse that "we all make mistakes." The court was further offended by defendant's attempt to shift responsibility by saying to the probation officer, " [']If only she wouldn't have pulled out in front of me.['] " The court pointed out that, in deciding when to pull out onto West Reservoir Boulevard, drivers assessed the safety of pulling out by assuming that traffic on West Reservoir Boulevard would be traveling no faster than the posted speed limit of 35 miles per hour—not 92 miles per hour. " [']If only she wouldn't have pulled out in front of me,['] " the court ventriloquized. "Okay. I got the message 100 percent with that."

¶ 102    The circuit court found "defendant's prospects for rehabilitation to be poor." Defendant was 33 years old, and the court "would have thought there would have been a list of successes, but there's not." The court noted that, according to the presentence investigation report, the "risk level is high."

¶ 103    The circuit court found that, on both counts, defendant was eligible for an extended term of imprisonment. The court sentenced him to 10 years' imprisonment on count I and a concurrent term of 6 years' imprisonment on count II, ordering that the 10-year prison term on count I would run consecutively to the sentence in case No. 20-CF-214.

¶ 104                F. The Motion to Reconsider the Sentences

¶ 105    On July 5, 2024, defense counsel filed a motion for reconsideration of the sentences. The motion made essentially six arguments.

¶ 106    The first argument had to do with a lack of notice, considering that the enhancing facts were not elements of the charged offenses. The postsentencing motion complained:

> "None of the elements of either Reckless Homicide or Aggravated Reckless Driving required the jury as a finding of fact to determine whether [defendant] drove more than twenty (20) miles [per hour] in excess of the posted speed limit and to determine the alleged age of Mrs. Kluber, the victim in count two, for the Aggravated Reckless Driving count."

Admittedly, the motion said, the State gave notice to the defense that the State "inten[ded] to seek consecutive sentences for the two counts and inten[ded] to seek an extended sentence for count two based on *Ms. Kluber's age* prior to going to trial and prior to the original sentencing hearing." (Emphasis added.) The State, however, "did not give notice of an intent to seek an extended sentence based on the alleged *speed* of [defendant's] vehicle prior to going to trial or

- 27 -

even prior to either of the two sentencing hearings." (Emphasis added.)

¶ 107    Second, several of the victim impact witnesses requested that the circuit court impose upon defendant the most severe sentence permissible by law. While acknowledging that "victim impact statements [were] allowed and appropriate during the sentencing hearing," the motion argued it was "improper for the witnesses to recommend to the court a specific sentence." The motion claimed that the "emotional appeal" in these recommendations "affected the trial court and led to a higher sentence than necessary."

¶ 108    Third, the postsentencing motion complained of the prosecutor's assertion to the jury that defendant had intentionally caused the collision. The motion acknowledged that when defense counsel objected to that assertion, the circuit court sustained the objection and instructed the jury to disregard that assertion. Later, however, at the sentencing hearing, the prosecutor repeated her assertion that defendant had intentionally caused the collision. The postsentencing motion argued: "Those allegations were inflammatory particularly since they were not based on any evidence presented during the trial or the sentencing hearing. Therefore, those allegations should not have been considered in fashioning [defendant's] sentence."

¶ 109    Fourth, the postsentencing motion argued that the circuit court had violated the double enhancement rule by using speed as an enhancing factor. According to the motion, defendant "was convicted solely based on the allegation that he was speeding at a high rate and that caused the accident that is the basis of the instant case." Even though "the exact speed as a matter of fact was never submitted to the jury for a factual finding, the sole issue in the instant case," the motion argued, "was [defendant's] speed." To convict defendant for speeding, only to turn around and enhance his punishment for speeding, was, defense counsel contended, a double enhancement.

¶ 110　　　　　Fifth, the postsentencing motion complained that the circuit court "effectively allowed the state to argue to the jury that [defendant's] alleged speed in the case and the injuries that resulted from the accident were enough to constitute reckless homicide" and defendant "was convicted based on that argument." The issue of whether defendant was traveling more than 20 miles per hour over the speed limit was never submitted to the jury, but "the same issue used to convict him was used to extend his sentence." The motion claimed that this use of speed to extend defendant's sentence violated the proportionate penalties clause (Ill. Const. 1970, art. I, § 11).

¶ 111　　　　　Sixth, the postsentencing motion argued that defendant's "constitutional rights" under *Apprendi* "were violated by his statutory maximum sentence being extended from a maximum of five (5) years to a maximum of ten (10) years without the factual finding by the jury of whether his vehicle was speeding in excess of twenty (20) miles [per hour] above the posted speed limit." *Apprendi* "was also violated on count two," the motion continued, "by increasing the statutory maximum based on Mrs. Kluber's age." Finally, according to the motion,

> "the last-minute assertion and lack of notice by the state robbed [defendant] of an opportunity to defend himself. The state had every opportunity to give notice as to their intentions prior to trial, which would have given the defense the opportunity to request a special finding instruction. The lack of notice by the state to the defense prevented the defense from making the request for the special findings instruction to be presented to the jury."

¶ 112　　　　　On July 15, 2024, the circuit court held a hearing on defendant's motion for reconsideration of the sentences. At this postsentencing hearing, defense counsel reiterated the arguments in the motion.

¶ 113    In response, the prosecutor acknowledged that the speed at which defendant had driven—"[n]inety six miles an hour in a 35 mile an hour zone"—was "part of the reason" why the jury found him guilty. Also, however, there was "the fact that he was driving down the center of the road, past the bus stop that was full of people at 10:30 in the morning, the imperfections in the road, all of that stuff was presented to the jury."

¶ 114    As for the lack of notice, the prosecutor said:

"[T]hat I didn't tell him or warn him that I would be seeking an extended term sentence is incorrect. I had warned him especially with Ms. Kluber. But prior to the hearing, the sentencing hearing we had—I told him I'm agreeing that the two victims are not consecutive, but I'm also going to seek an extended term sentence on the fact he was going more than 20 miles per hour over the speed limit. I did show him a copy of that from the code."

The prosecutor explained that, during the recess in the sentencing proceeding for the purpose of researching the question of consecutiveness, she found no case law for her position that the existence of two victims justified consecutive sentencing (and, accordingly, she abandoned that position). However, during this sentencing recess, she discovered that defendant was eligible for an extended prison term on count I "because he was going in greater excess speed of 20 miles [per hour] over the speed limit," and she "showed [defense counsel] a copy of that section in the code," thereby "warn[ing] [him] ahead of time."

¶ 115    The circuit court asked defense counsel, "When did you ultimately get the notice?" He answered, "The notice was a few minutes before we had the second hearing. Well, the second scheduled hearing for the sentencing. I didn't receive notice prior to trial." The point he meant to make, defense counsel explained, was that he received no notice before trial. If he

- 30 -

had received notice before trial, he "would have specifically asked for a special finding by the jury that they would have to have found he was driving at 20 or more miles [per hour] above the posted speed limit."

¶ 116    The circuit court ruled, "I find Defense's claims to be without merit. Motion for reconsideration of sentence is denied."

¶ 117    This appeal followed.

¶ 118                                II. ANALYSIS

¶ 119                A. The Denials of Defendant's Motions for Discovery

¶ 120    Defendant contends that, at the hearings on his motions for discovery, the circuit court should not have denied the motions and should not have told defense counsel to subpoena the police report himself but, rather, the court itself should have subpoenaed Kluber's medical records and the police report and should have "review[ed] the records," *in camera*, "for relevant information to Kluber's prior accident and ability to safely drive." Defendant contends that *People v. Bean*, 137 Ill. 2d 65 (1990), mandated that procedure.

¶ 121    That contention is questionable. It is true that, in *Bean*, in response to the defendant's motion for discovery, the circuit court chose to subpoena a witness's mental health records that the defense wanted to obtain for use in cross-examining the witness (see *id.* at 90), but we do not see where, in *Bean*, the supreme court said that the circuit court had an obligation to subpoena the records. Instead, the supreme court held that examining the mental health records *in camera* and culling out the irrelevant pages from the relevant pages "did not violate [the] defendant's sixth amendment [(U.S. Const., amend. VI)] rights to confront and to have an opportunity to effectively cross-examine witnesses against him." *Id.* at 100. That was not quite the same as saying that, as a matter of mandated procedure, a circuit court itself had to subpoena

medical records when a defendant requested them in a motion for discovery.

¶ 122      Assuming, though, for the sake of argument, that *Bean* requires a circuit court to subpoena documents for the defense, "defendant asks this court to reverse the trial court for its failure to grant relief defendant never requested." *People v. Martin*, 266 Ill. App. 3d 369, 376 (1994). It does not appear that defendant requested the circuit court to subpoena any documents. Instead, defendant filed *motions for discovery*, which, by supreme court rule, were motions requesting that "the State *** disclose to defense counsel *** material and information within [the State's] possession or control." Ill. S. Ct. R. 412(a) (eff. Mar. 1, 2001). In fact, defendant's motions for discovery requested that the court "order *** the state to tender to the defense" the listed "items."

¶ 123      Defense motions for discovery were governed by Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001). Therefore, to establish that the circuit court erred by denying his motions for discovery, defendant would have to establish that Rule 412 required that the motions be granted. Defendant, however, does not discuss or cite Rule 412. Instead, he invokes *Bean*.

¶ 124      Again, though, the circuit court's supposed duty under *Bean* to subpoena documents for the defense was not at issue below. Issues not raised below are forfeited. *People v. Weber*, 98 Ill. App. 3d 631, 633 (1981). We could not reasonably fault the court for omitting to subpoena records when defense counsel never requested the court to subpoena records (setting aside the question of whether *Bean* really held that a circuit court had to do discovery for the defense and also setting aside the practical difficulty of how the circuit court could have known what medical providers to subpoena any more than defense counsel knew).

¶ 125           B. Bishoff and Moore Never Certified as Expert Witnesses

¶ 126      Defendant argues the circuit court erred by allowing Bishoff and Moore to

provide expert opinions in their testimony without their first being tendered to the court, and certified by the court, as experts. The State raises the question of what authority requires that a witness be tendered to the court as an expert and certified by the court as an expert before the witness offers an expert opinion. The State observes that Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) ("Testimony by Experts") contains no such requirement. In fact, in *People v. Pingleton*, 2021 IL App (4th) 180751, ¶ 46, the majority observed, "The Illinois Rules of Evidence regarding expert witnesses contain no requirement that the trial court 'certify' a witness before a witness may provide opinion testimony." To show that an error was made, defendant first must show that a legal authority of some type—a case, a statute, a supreme court rule—was violated. Defendant fails to take this first step of identifying the authority that was violated when, after describing their qualifications as crash investigators, Bishoff and Moore simply testified, without further procedures, as experts in crash investigation.

¶ 127 Quoting a dissent by Justice Heiple in *People v. Novak*, 163 Ill. 2d 93, 120 (1994) (Heiple, J., dissenting), defendant complains that " '[b]ecause the witnesses were not offered as experts, defendant did not have the opportunity to cross-examine the witnesses for the purpose of challenging their certification as experts.' " But Bishoff and Moore, in their testimony, offered themselves as experts. Bishoff testified he had taken two courses on crash investigation and a course on crash reconstruction and that his job at the Peoria Police Department was to investigate traffic crashes. Surely, that prelude was a sign that he was going to do more than offer lay opinions. Moore testified that because he was "certified or an expert in the area of crash data retrieval," he knew how to interpret crash data retrieval reports. Since Bishoff and Moore, on direct examination by the prosecutor, brought up their professional qualifications, defense counsel had an opportunity and occasion to cross-examine them on their qualifications.

¶ 128    At trial, defense counsel never objected to Bishoff's testimony as a whole, or to Moore's testimony as a whole, on the ground that they lacked relevant expertise. Rather, defense counsel made that objection only to certain, isolated parts of their testimony. Then later, in his posttrial motion, defense counsel was silent about the fact that the State never tendered Bishoff and Moore to the court as experts and never obtained their judicial certification as experts before eliciting expert testimony from them (assuming those procedures were required). "[T]o preserve an issue for review on appeal, the defendant must object at trial and raise the issue in a written posttrial motion." *People v. Jackson*, 2022 IL 127256, ¶ 15. Without those preservative measures, this issue is forfeited. See *id.*

¶ 129    Defendant argues that the plain-error doctrine should avert the forfeiture because "the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51.

¶ 130    We disagree that the evidence was closely balanced. It was undisputed that defendant was driving 92 miles per hour in a 35 mile per hour speed zone on West Reservoir Boulevard. In the photographs that Hergenrother took, the arcing tire mark leads toward the Kia lying on its side in the grass alongside the eastbound lane. This black mark on the street, curving from the westbound lane toward the eastbound lane, resembles a gesture at the culpable vehicle—the Kia. Granted, Wilson testified that Kluber pulled out in front of defendant, but Wilson's testimony was self-contradictory: at first he testified that the truck slammed into the car, and then he testified that the car slammed into the truck. Nor did his testimony make much sense. If Kluber turned right, or east, onto West Reservoir Boulevard from North Rochelle Lane, as Wilson testified she did, it is unclear how she could have pulled out in front of defendant's westbound vehicle. Also, the State makes a good point that the collision was frontal (as is clear

from the photographs) and that the physical evidence of a frontal collision is irreconcilable with Wilson's claim that Kluber pulled out in front of defendant. Her car was not T-boned; it was hit head-on. In the end, on re-cross-examination, Wilson admitted telling the police he was uncertain what had happened. His certainty did not seem to have grown over the intervening years.

¶ 131　　Not only was the evidence of defendant's guilt overwhelming, but the lack of expert certification of which defendant complains, for the first time on appeal, was harmless. Crash investigation was what Bishoff and Moore were trained to do. They had taken courses in the field at Northwestern University, and they had job experience. Skipping the formality of their judicial certification as experts caused the defense no prejudice—and arguably, was better for the defense instead of having the court declare, in the hearing of the jury, what was already obvious: that Bishoff and Moore were experts in crash investigation.

¶ 132　　The supreme court has explained that review under the closely balanced prong of the plain-error doctrine is similar to an evaluation of prejudice when a defendant claims ineffective assistance of counsel. *People v. White*, 2011 IL 109689, ¶ 133. For a claim of ineffective assistance, the question is whether hypothetically subtracting the error from the proceedings would have resulted in a reasonable probability of a different outcome. See *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The supposed error here was the prosecutor's failure to request a ruling from the circuit court that Bishoff and Moore were experts in crash investigation. We find no reasonable probability of a different outcome had the prosecutor tendered Bishoff and Moore as experts. Given Bishoff's and Moore's undisputed training and job experience, the circuit court surely would have certified them as experts in crash investigation. Thus, we are unconvinced that "the error alone severely threatened to tip the scales of justice" (*Sebby*, 2017 IL 119445, ¶ 51) or that the defense suffered any prejudice to support a

claim of ineffective assistance of counsel (see *People v. Gray*, 2025 IL App (1st) 191086-B, ¶ 33).

¶ 133          C. Accusing Defendant of Intentionally Causing Terrell's Death

¶ 134          The first time the prosecutor asserted, in her closing argument, that defendant had intentionally caused Terrell's death, defense counsel did not object, thereby forfeiting the issue of whether the prosecutor was entitled to make that assertion. See *People v. Cosmano*, 2011 IL App (1st) 101196, ¶¶ 54-55.

¶ 135          The second time the prosecutor asserted, in her closing argument, that defendant had intentionally caused Terrell's death, defense counsel objected, and the circuit court sustained the objection and instructed the jury to disregard the assertion. Defendant maintains, however, that this curative instruction was ineffectual and that the prosecutor's repeated assertion that defendant intentionally killed Terrell lacked a basis in the evidence, inflamed the jury's passions, and deprived him of a fair trial.

¶ 136          But the circuit court instructed the jury to disregard that assertion, and the supreme court has held that "jurors are presumed to follow [the circuit court's] instructions." *People v. Birge*, 2021 IL 125644, ¶ 40; see *People v. Glasper*, 234 Ill. 2d 173, 201 (2009). Granted, in an older case that defendant cites, the supreme court held, "Instructing the jury that arguments are not evidence will not, in every instance, cure the defect caused by the introduction of such evidence." *People v. Blue*, 189 Ill. 2d 99, 132 (2000). That holding in *Blue* is inapposite, however, because in this case, the circuit court did more than instruct the jury, in a general way, that arguments are not evidence. The court instructed the jury, more specifically, to disregard the prosecutor's comment to the effect that defendant had intended to cause Terrell's death. We presume that the jury followed the court's instruction. See *Birge*, 2021 IL 125644, ¶ 40; *Glasper*,

234 Ill. 2d at 201.

¶ 137                         D. Rejection of the Nonpattern Jury Instruction

¶ 138         Defense counsel tendered a nonpattern jury instruction stating that "driving in excess of the lawful speed limit alone would not support a finding that the conduct of the defendant was willful, wanton, or reckless in the absence of another factor or factors." The circuit court rejected this nonpattern jury instruction, and defendant contends that the court thereby erred.

¶ 139         More precisely, the question is whether the circuit court's rejection of this nonpattern jury instruction was an abuse of discretion. See *People v. Garcia*, 165 Ill. 2d 409, 432 (1995). To find an abuse of discretion, we would have to be able to say that refusing to give this nonpattern jury instruction was arbitrary or unreasonable. See *People v. Donoho*, 204 Ill. 2d 159, 182 (2003).

¶ 140         Defendant argues he has established cause for reversal under this highly deferential standard of review because, in *People v. Barham*, 337 Ill. App. 3d 1121, 1130 (2003), the appellate court held that "evidence of excessive speed, by itself, is not sufficient to sustain a conviction of reckless homicide" and because, in *People v. Shakirov*, 2017 IL App (4th) 140578, ¶ 93, the appellate court repeated *Barham*'s holding.

¶ 141         The problem with defendant's reliance on *Barham* and *Shakirov* is that those cases had nothing to do with jury instructions. Instead, when the appellate court stated, in those cases, that "evidence of excessive speed, by itself, is not sufficient to sustain a conviction of reckless homicide," the appellate court was making an argument—and rightly so—in support of its conclusion that reckless homicide was unproven. See *Shakirov*, 2017 IL App (4th) 140578, ¶ 94; *Barham*, 337 Ill. App. 3d at 1131. Argumentative language is a virtue in arguments, but

according to Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013), argumentative language is not a virtue in jury instructions.

¶ 142        Under Rule 451(a), the "applicable" pattern jury instruction must be used "unless the court determines that it does not accurately state the law." *Id.* The rule further provides that "[w]henever IPI Criminal does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given on that subject should be simple, brief, impartial, and free from argument." *Id.*

¶ 143        Thus, the first question is whether the circuit court could have reasonably regarded the applicable pattern jury instructions as accurately stating the law regarding the offense of reckless homicide. See *id.*

¶ 144        In accordance with Illinois Pattern Jury Instructions, Criminal, No. 7.10A (eff. Jan. 1, 2022), the circuit court instructed the jury:

> "To sustain the charge of reckless homicide, the State must prove the following propositions:
>
> First proposition: That the defendant caused the death of Aries Terrell by driving a motor vehicle.
>
> And second proposition: That the defendant drove a motor vehicle recklessly.
>
> And third proposition: That the defendant drove a motor vehicle in a manner likely to cause death or great bodily harm.
>
> If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 145 In accordance with IPI Criminal No. 23.32X, the circuit court instructed the jury that

"To sustain the charge of aggravated reckless driving, the State must prove the following propositions:

First proposition: That the defendant drove a vehicle with the willful or wanton disregard for the safety of persons or property.

And second proposition: That in doing so the defendant caused great bodily harm to Linda Kluber.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

¶ 146 In accordance with IPI Criminal No. 5.01, the circuit court instructed the jury on recklessness as follows:

"A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes and gross deviation from the standard of care which a reasonable person would exercise in the situation.

An act performed recklessly is performed wantonly."

¶ 147    In accordance with Illinois Pattern Jury Instructions, Criminal, No. 5.01B (approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.01B), the circuit court instructed the jury:

"A person knows the nature or attendant circumstances of his conduct when he is consciously aware that his conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists."

¶ 148    In accordance with IPI Criminal No. 5.01B[3], the circuit court instructed the jury that "[c]onduct performed knowingly or with knowledge is performed willfully."

¶ 149    We do not understand defendant to contend that those foregoing pattern jury instructions failed to "accurately state the law." Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013). Instead, he contends that those pattern jury instructions "did not adequately define the offense for the jury"—which is to say, they were incomplete, according to defendant. This claim of incompleteness implicates the final sentence of Rule 451(a): "Whenever IPI Criminal does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given on that subject should be simple, brief, impartial, and free from argument." *Id.*

¶ 150    The pattern jury instructions already said, in so many words, that speed alone was insufficient to prove reckless homicide and aggravated reckless driving. Because the pattern jury instructions defined recklessness as including a "conscious[ ] disregard[ ]" of "a substantial and unjustifiable risk that circumstances exist or that a result will follow," defense counsel already could argue (on the authority of the soon-to-be-given jury instructions) that speed was only one

circumstance, not the "circumstances" in the plural. Defense counsel could already argue that assessing the "risk" that "a result [would] follow" meant regarding speed not in the abstract or in isolation but, rather, in the context or environment in which defendant sped. Likewise, the "attendant circumstances of his conduct" was a contextualizing phrase, requiring the jury to place defendant's conduct of "speeding" in the "attendant circumstances" of that conduct.

¶ 151          So, the pattern jury instructions that the circuit court decided it would give the jury already equipped defense counsel to argue what his rejected nonpattern jury instruction said: that "driving in excess of the lawful speed limit alone would not support a finding that the conduct of the defendant was willful, wanton, or reckless in the absence of another factor or factors"—in other words, that defendant's conduct of speeding must be evaluated in the context of the circumstances in which he sped. Because that argument could already be developed from the pattern jury instructions, the proposed nonpattern jury instruction could reasonably be regarded as argumentative in favor of the defense. See *id.* Therefore, we find no abuse of discretion in the circuit court's refusal to give the nonpattern jury instruction. See *Garcia*, 165 Ill. 2d at 432.

¶ 152                              E. The Sufficiency of the Evidence

¶ 153          Defendant claims that "[t]he only factor aside from speeding that the State argued show[ing] recklessness was alleged lane violations" and that the evidence regarding lane violations "was conflicting, leaving ample room for doubt." Because the appellate court has held that " 'evidence of excessive speed, by itself, is not sufficient to sustain a conviction of reckless homicide' " (*Shakirov*, 2017 IL App (4th) 140578, ¶ 93 (quoting *Barham*, 337 Ill. App. 3d at 1130)) and because (according to defendant) "[t]he State established nothing more than that [he] was speeding," the State failed to prove reckless homicide.

¶ 154    It is untrue, though, that speed and lane violations were the only factors the State argued. The prosecutor pointed out that "defendant recklessly sped 90 plus miles [per hour] around Reservoir." She continued:

> "Not only was it going at *** least over 55 miles [per hour] over the speed limit, but he was seen on video passing a car in the center lane while another car in the eastbound lane was going by. There were people outside waiting for a bus on this road. This is 10:35 in the morning."

In that passage of her argument, the prosecutor referenced, first of all, West Reservoir Boulevard. That the street on which defendant drove 92 miles per hour was West Reservoir Boulevard, a city street lined with residences and businesses instead of a lonely country road, was a significant factor in the assessment of recklessness. The prosecutor referenced that there was traffic on the street—another factor. Still another factor the prosecutor referenced was the time of day, 10:30 a.m., when one would have expected people to be awake, out of their residences, and present on the street, heading to their various destinations. The prosecutor also referenced the presence of pedestrians at the bus stop. Another indicium of recklessness, the prosecutor argued, was defendant's illegal act of passing cars in the center lane, as captured on surveillance video.

¶ 155    Subsequently in her closing argument, the prosecutor also referenced the streets that intersected West Reservoir Boulevard. She observed, "At any time any other car could have pulled out."

¶ 156    The prosecutor also observed that defendant "tried to navigate a turn at 90 miles an hour." Defendant argues, "This wheel turn at the last minute also indicates an attempt to avoid the crash. And an attempt to avoid a collision cannot amount to a conscious disregard of a

substantial and unjustifiable risk for the purposes of reckless homicide." The jury could have taken the view, however, that Kluber did not pull out in front of defendant but that, rather, she was in the eastbound lane of West Reservoir Boulevard and that defendant's act of steering toward her was not "an attempt to avoid the crash" but, instead, was another factor adding up to recklessness.

¶ 157    In sum, then, when we view all the evidence in the light most favorable to the prosecution, as we are required to do, the State proved several factors relevant to recklessness in addition to the mere fact that defendant was speeding, and a rational trier of fact could find, beyond a reasonable doubt, the elements of reckless homicide and aggravated reckless driving. See *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004).

¶ 158                    F. An Extended Term on the Lesser Class of Offense

¶ 159    Count II of the indictment charged defendant with aggravated reckless driving (see 625 ILCS 5/11-503(a)(1) (West 2020)), a Class 4 felony (see *id.* § 11-503(c)) punishable, normally, by imprisonment for "not less than one year and not more than 3 years" (730 ILCS 5/5-4.5-45(a) (West 2020)). The extended term of imprisonment for a Class 4 felony was "not less than 3 years and not more than 6 years." *Id.* The circuit court sentenced defendant to six years' imprisonment for count II, an extended term.

¶ 160    Defendant argues that the extended term of imprisonment on count II was statutorily unauthorized because reckless homicide, a Class 3 felony, was a more serious offense than aggravated reckless driving, a Class 4 felony. Extended-term sentencing applies only to offenses "within the class of the most serious offense of which the offender was convicted." *Id.* § 5-8-2(a). The State concedes that this argument by defendant is correct, and we accept the State's concession.

¶ 161　　　　The correct remedy, as the State recommends, is to vacate the extended-term sentence on count II and to impose the maximum nonextended term. See *People v. Drummond*, 2025 IL App (4th) 240946-U, ¶ 49. Therefore, we vacate the extended term of six years' imprisonment on count II for aggravated reckless driving, and we impose, instead, a three-year term of imprisonment on count II. See 730 ILCS 5/5-4.5-45(a) (West 2020); *Drummond*, 2025 IL App (4th) 240946-U, ¶ 49.

¶ 162　　　　　　　G. Lack of Notice of the Intent to Seek an Extended Term

¶ 163　　　　At the sentencing hearing, the circuit court asked if the sentencing range on count I was two to five years. (Reckless homicide (see 720 ILCS 5/9-3(a) (West 2020)) was a Class 3 felony (see *id.* § 9-3(d)(2)) normally punishable by imprisonment for "not less than 2 years and not more than 5 years" (730 ILCS 5/5-4.5-40(a) (West 2020)).) The prosecutor responded in the negative because, according to the prosecutor, defendant was eligible for an extended prison term under section 5-5-3.2(a)(20) of the Unified Code of Corrections (Unified Code) (*id.* § 5-5-3.2(a)(20), which provided as follows:

　　　　　"(a) The following factors *** may be considered by the court as reasons to impose a more severe sentence under Section 5-8-1 [(*id.* § 5-8-1)] or Article 4.5 of Chapter V [(*id.* ch. V, art. 4.5)]:

　　　　　　　　　　　　* * *

　　　　　　　(20) the defendant (i) committed the offense of reckless homicide *** and (ii) was operating a motor vehicle in excess of 20 miles per hour over the posted speed limit."

The "more severe sentence under *** Article 4.5" (*id.* § 5-5-3.2(a)), or the extended term of imprisonment, for a Class 3 felony was "a term not less than 5 years and not more than 10 years"

(*id.* § 5-4.5-40(a)).

¶ 164      The circuit court inquired of defense counsel whether he agreed that defendant was "extended term eligible." Defense counsel objected that an extended prison term for count I would violate the eighth amendment (U.S. Const., amend. VIII) and the proportionate penalties clause (Ill. Const. 1970, art. I, § 11). He argued that defendant already had been convicted of reckless homicide because of speed and that to now "turn around and also make him extendable based on the speed" would be a double enhancement and would violate the eighth amendment. Unconvinced by this double enhancement objection, the circuit court sentenced defendant to an extended prison term of 10 years for count I.

¶ 165      On appeal, defendant challenges the extended prison term he received for count I. The reason he gives for this challenge is the State's noncompliance with section 111-3(c-5) of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/111-3(c-5) (West 2020)), the first two sentences of which provide as follows:

> "(c-5) Notwithstanding any other provision of law, in all cases in which the imposition of the death penalty is not a possibility, if an alleged fact (other than the fact of a prior conviction) is not an element of an offense but is sought to be used to increase the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for the offense, the alleged fact must be included in the charging instrument or otherwise provided to the defendant through a written notification before trial, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt. Failure to prove the fact beyond a reasonable doubt is not a bar to a conviction for commission of the offense, but is a bar to increasing, based on that fact, the range of penalties for the

offense beyond the statutory maximum that could otherwise be imposed for that offense."

¶ 166    Section 111-3(c-5) "brought the [Procedure] Code into conformity with *Apprendi*." *People v. Jones*, 2016 IL 119391, ¶ 14. In *Apprendi*, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.

¶ 167    Defendant contends, on appeal, that his act of driving on West Reservoir Boulevard at a speed of more than 20 miles per hour above the posted speed limit was a fact, other than the fact of a prior conviction, that the State and the circuit court used to increase the ordinary (unenhanced) penalty for reckless homicide that he otherwise would have received. In this case, in which the death penalty was not a possibility (see 725 ILCS 5/111-3(c) (West 2020)), driving "in excess of 20 miles per hour over the posted speed limit" (730 ILCS 5/5-5-3.2(a)(20) (West 2020)) was not an element of reckless homicide (see 720 ILCS 5/9-3(a) (West 2020)). Nevertheless, the State sought to use the fact of defendant's having driven more than 20 miles per hour over the speed limit "to increase the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for the offense" (725 ILCS 5/111-3(c-5) (West 2020)). Therefore, section 111-3(c-5) required that this fact (driving more than 20 miles per hour above the speed limit) "be included in the charging instrument or otherwise provided to the defendant through a written notification before trial, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt" (*id.*). Those procedures were not followed. Although count I of the indictment alleged that on September 20, 2020, defendant drove "at an excessive rate of speed," count I never alleged that his speed was more than 20

- 46 -

miles per hour over the speed limit, nor was the jury asked to find whether he exceeded the speed limit by more than 20 miles per hour. Defendant is correct that *Apprendi*, codified in section 111-3(c-5), was, in this respect, not followed.

¶ 168 At trial, however, when the State presented evidence of the precise speed at which defendant had been driving, it does not appear that defense counsel objected on the ground of *Apprendi* or section 111-3(c-5). Nor did the motion for a new trial contain any mention of *Apprendi* or section 111-3(c-5). In *People v. Crespo*, 203 Ill. 2d 335, 347-48 (2001), the supreme court held that if the "defendant did not object at the time of trial," "the proper inquiry" was "whether the *Apprendi* violation constituted 'plain error,' "—more precisely, plain error that "was prejudicial." The implication of that holding in *Crespo* is that, because of the lack of an *Apprendi* objection at trial, there was a procedural forfeiture that the defendant would have to undo through the plain-error doctrine.

¶ 169 The question might be raised, though, when the State called Moore to testify to how fast the crash data retrieval report said that defendant had been driving, how would defense counsel have known, at that point, that the State meant to prove the aggravating factor in section 5-5-3.2(a)(2) of the Unified Code (see 730 ILCS 5/5-5-3.2(a)(20) (West 2020)) instead of merely the reckless state of mind in the definition of reckless homicide (see 720 ILCS 5/9-3(a) (West 2020))? And how, therefore, would defense counsel have known to object, especially considering the lack of prior notification to which the defense would have been statutorily entitled—and, what was worse, the prosecutor's representation, at the beginning of the trial, that count I was nonextendable? Those would be good questions, perhaps unanswerable questions, but *Crespo* holds as it holds, and we are bound by *Crespo*. See *Crespo*, 203 Ill. 2d at 347-48.

¶ 170 Even if the violation of *Apprendi* or section 111-3(c-5) were regarded as a

sentencing issue instead of (as in *Crespo*) a trial issue, defense counsel's contemporaneous objection contained no mention of *Apprendi* or section 111-3(c-5) *with reference to count I* when, at the beginning of the reconvened sentencing hearing, the prosecutor invoked the aggravating factor in section 5-5-3.2(a)(2). Granted, the postsentencing motion raised *Apprendi* with reference to count I, but that was not enough: a contemporaneous objection also was required to preserve a sentencing error for review. See *People v. Hillier*, 237 Ill. 2d 539, 544 (2010).

¶ 171　　　The supreme court held in *Crespo*, 203 Ill. 2d at 347-48, that if an *Apprendi* issue were unpreserved for review, the plain-error doctrine required that the defendant "show[ ] the error was prejudicial." In *Crespo*, for example, "the extended-term sentence was based upon a post-trial finding by the circuit court that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty." *Id.* at 346. This posttrial finding by the court, the defendant in *Crespo* argued, failed to comply with *Apprendi*. See *id.* The supreme court had "no doubt," however, "that a jury, presented with [the] facts, would have found that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty." *Id.* at 348. Therefore, the supreme court concluded that the "defendant ha[d] failed to show that the error was prejudicial." *Id.* at 349.

¶ 172　　　By analogy, we have no doubt that, on the basis of the data downloaded from the Kia's airbag control module, the jury would have found that defendant was "operating a motor vehicle in excess of 20 miles per hour over the posted speed limit." 730 ILCS 5/5-5-3.2(a)(20) (West 2020). Therefore, defendant has failed to show prejudice from the *Apprendi* violation, and his forfeiture of this *Apprendi* issue will be honored. See *Crespo*, 203 Ill. 2d at 349.

¶ 173　　　For the same reason, defendant has failed to show prejudice to support a claim of

ineffective assistance of counsel under *Strickland*, 466 U.S. at 687. See *People v. Easley*, 192 Ill. 2d 307, 332 (2000) ("Since the actions complained of did not rise to the level of plain error, the failure of defendant's trial counsel to object thereto did not prejudice defendant under *Strickland*.").

¶ 174                    H. Other Alleged Sentencing Errors

¶ 175        On appeal, defendant raises eight further claims of sentencing error.

¶ 176                    1. *Victim Impact Statements by Nonrepresentatives*

¶ 177        First, defendant contends that the circuit court erred by allowing the presentation of victim impact statements by persons who were not "representative[s]" within the meaning of section 6(a-1) of the Rights of Crime Victims and Witnesses Act (725 ILCS 120/6(a-1) (West 2020)), a term that, to quote the statute, "includes the spouse, guardian, grandparent, or other immediate family or household member of an injured or deceased person."

¶ 178        The supreme court has held that, "to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *Hillier*, 237 Ill. 2d at 544. At the sentencing hearing, defense counsel did not object that nonrepresentatives were making victim impact statements. Nor did defense counsel raise this issue in his postsentencing motion. Therefore, the issue is forfeited. See *id.*

¶ 179                    2. *Multiple Victim Impact Statements*

¶ 180        Second, defendant complains that the circuit court allowed the presentation of multiple victim impact statements without "a reasoned exercise of *** discretion." *People v. Larson*, 2022 IL App (3d) 190482, ¶ 38. At the sentencing hearing, defense counsel never objected to the number of victim impact statements, nor did he raise this issue in his postsentencing motion. Therefore, this issue is forfeited. See *id.*

¶ 181          3. *Impermissible Content in the Victim Impact Statements*

¶ 182          Third, defendant argues the circuit court erred by "allowing the content of admitted statements to go beyond the impact of the offense on the speaker" and into condemnations of defendant, unrelated prosecutions, and sentencing recommendations. At the sentencing hearing, defense counsel did not object to the content of the victim impact statements. Therefore—even though the postsentencing motion complained that sentencing recommendations were made in the victim impact statements—this objection is forfeited for lack of a contemporaneous objection. See *id.*

¶ 183          4. *Accusing Defendant of Intentionality*

¶ 184          Fourth, in her sentencing argument, the prosecutor repeated her accusation that defendant intentionally caused Terrell's death (although, afterward at the sentencing hearing, the circuit court said, "Of course it was an accident. There's no doubt [defendant] did not target Linda Kluber and hope that he could run into her and succeed. Obviously that was not the case."). Because defense counsel did not object at the sentencing hearing when the prosecutor accused defendant of intentionally causing Terrell's death, this objection is forfeited. See *id.* Inclusion of the issue in the postsentencing motion was insufficient without a contemporaneous objection. See *id.*

¶ 185          5. *Deterring an Unintentional Crime*

¶ 186          Fifth, defendant argues the circuit court erred by citing, as an aggravating factor, the need for deterrence, considering that "deterrence is nearly impossible to achieve in this case as it was by definition an unintentional crime." See *People v. Martin*, 119 Ill. 2d 453, 459 (1988). At the sentencing hearing and in his postsentencing motion, defense counsel never objected that the unintentional crimes of reckless homicide and aggravated reckless driving were

undeterrable. Therefore, this objection is forfeited. See *Hillier*, 237 Ill. 2d at 544.

¶ 187                                    6. *Double Enhancement*

¶ 188          Sixth, defendant maintains that, in making such remarks as "driving 92 miles an hour scares the heck out of me" and in referring to "going 92 miles an hour on my 35 mile an hour street," the circuit court "consider[ed] the harm that [defendant's] excessive speed posed"—an erroneous consideration, according to defendant, "because [excessive speed] was inherent in the fact for which he was given an extended-term sentence." He points out that, under *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992), "[t]here is a general prohibition against the use of a single factor both as an element of a defendant's crime and as an aggravating factor justifying the imposition of a harsher sentence than might otherwise have been imposed."

¶ 189          The problem with this argument is that driving 92 miles per hour was not, strictly speaking, an element of the offenses. Rather, to prove reckless homicide, the State had to prove recklessness (see 720 ILCS 5/9-3(a) (West 2020)), and to prove aggravated reckless driving, the State had to prove "willful or wanton disregard for the safety of persons or property" (625 ILCS 5/11-503(a)(1) (West 2020)). There are degrees of recklessness and of willful or wanton disregard. By noting that defendant was driving 92 miles per hour in a 35-mile-per-hour speed zone (instead of recklessly driving at, say, only twice the speed limit), the circuit court pointed out the extremity of defendant's recklessness, the extremity of his willful or wanton disregard. When a court decides on a sentence, it is not a double enhancement if the court takes into account the egregiousness with which the defendant accomplished the elements of the offense—how the defendant went over and above in committing the offense. See *People v. Salvidar*, 113 Ill. 2d 256, 271-72 (1986); *People v. Browner*, 2022 IL App (1st) 200715-U, ¶ 49. By considering the "degree or gravity of defendant's conduct" or the "nature and extent" of his

recklessness, the court did not inflict a double enhancement. *Salvidar*, 113 Ill. 2d at 271-72.

¶ 190                    7. *Consecutiveness to Case No. 20-CF-214*

¶ 191          Seventh, defendant argues that by making the 10-year prison sentence for reckless homicide run consecutively to the 10-year prison sentence he received in case No. 20-CF-214, the circuit court abused its discretion because making those sentences consecutive was unnecessary for the protection of the public and nonmandatory consecutive sentences under section 5-8-4(c)(1) of the Unified Code (730 ILCS 5/5-8-4(c)(1) (West 2020)) are "rarely appropriate" (*People v. Gray*, 121 Ill. App. 3d 867, 873 (1984)). The postsentencing motion contained no mention of the consecutiveness of the 10-year prison term in the present case to the 10-year prison term in the aggravated battery case. Therefore, this sentencing issue is procedurally forfeited. See *Hillier*, 237 Ill. 2d at 544.

¶ 192                    8. *Failure to Consider Mitigating Factors*

¶ 193          At the sentencing hearing, the circuit court found no mitigating factors. On appeal, defendant contends the court thereby erred because there were mitigating factors, namely, his strong family support, his remorse and acceptance of responsibility, the familial hardship that would be caused by lengthy imprisonment, and his rehabilitative potential. The postsentencing motion, however, never contended that the court overlooked any mitigating factors. Therefore, this sentencing issue is procedurally forfeited. See *id.*

¶ 194                              I. Plain Error

¶ 195          Defendant concedes that "these errors"—by which, in context, he means the sentencing errors he raises on appeal—"were not preserved." Nevertheless, he contends that the doctrine of plain error should avert the forfeiture of his contentions of sentencing error "because the evidence at sentencing was so closely balanced," by which he seems to mean that the

aggravating factors were offset by mitigating factors. See *id.* at 545.

¶ 196    But the circuit court did not have to agree that there were mitigating factors. Let us consider, one by one, what defendant argues were mitigating factors.

¶ 197                        1. *Strong Family Support*

¶ 198    Defendant argues that "[t]he strong support of [his] family will motivate him to stay on the right path, even outside of prison, and it is mitigating." The strong support of defendant's family, however, has not motivated him to refrain from committing aggravated unlawful use of a weapon, a Class 2 felony, in case No. 08-CF-1283; battery, a Class A misdemeanor, in case No. 15-CM-516; aggravated battery, a Class X felony, in case No. 20-CF-214; and (while he was on pretrial release in case No. 20-CF-214) reckless homicide, a Class 3 felony, and aggravated reckless driving, a Class 4 felony, in the present case. Therefore, the court could reasonably find that the support of defendant's family was not mitigating.

¶ 199                    2. *Acceptance of Full Responsibility*

¶ 200    Defendant argues the circuit court "failed to give proper weight to the fact that [he] took responsibility for his actions both in the [presentence investigation report] and in his statement in allocution." It is true that, in his statement in allocution, defendant said he "was absolutely wrong for driving that fast" and that he "accept[ed] full responsibility for [his] actions." It also is true that, according to the presentence investigation report, defendant told the probation officer that "he absolutely should not have been going that fast and that he was wrong for going that fast."

¶ 201    On the other hand, to quote the presentence investigation report, "defendant reported there was a vehicle that pulled out in front of him and if the car did not pull out in front of him there would have been no accident." Also, in his conversation with the probation officer,

defendant merely granted the possibility that "the outcome *could* have been different" if he had not been driving so fast. (Emphasis added.) Arguably, his blaming the other driver was troubling in two ways. First, the evidence could be regarded as proving it was unlikely that Kluber pulled out in front of defendant but that, instead, it was likely that defendant left his westbound lane and drove toward Kluber in the eastbound lane. It is unclear who else supposedly would have pulled out in front of him. So, the excuse that defendant gave the probation officer (and the police at the scene of the accident) could be regarded as a lie. Second, the excuse was an attempt to shift responsibility when the responsibility was defendant's alone. Therefore, the circuit court had some reason to doubt defendant's sincerity when, in his statement in allocution, he accepted full responsibility, and the court could reasonably find no mitigation in this respect.

¶ 202    Also, the circuit court had some reason to doubt the sincerity of defendant's expression of remorse, considering that, in his statement in allocution, defendant seemed to portray himself as one of the victims, as a cosufferer, as one of the unfortunates to whom something bad just happened. He told Kluber, "I'm sorry for all the surgeries and therapy you had to go through. It was hard for me with a broken femur." After doing what he did to Kluber, to then tell her, in effect, "You're not the only one who suffered," showed, arguably, a lack of true appreciation for his culpability.

¶ 203                            3. *Familial Hardship*

¶ 204    Defendant argues that by ignoring the hardship that sending him to prison for a long time would inflict on his family, the circuit court failed to comply with section 5-5-3.1(a)(18) of the Unified Code (730 ILCS 5/5-5-3.1(a)(18) (West 2020)). That section provides as follows:

"(a) The following grounds shall be accorded weight in favor of

withholding or minimizing a sentence of imprisonment:

* * *

(18) The defendant is pregnant or is the parent of a child or infant whose well-being will be negatively affected by the parent's absence. Circumstances to be considered in assessing this factor in mitigation include:

(A) that the parent is breastfeeding the child;

(B) the age of the child, with strong consideration given to avoid disruption of the caregiving of an infant, pre-school or school-age child by a parent;

(C) the role of the parent in the day-to-day educational and medical needs of the child;

(D) the relationship of the parent and the child;

(E) any special medical, educational, or psychological needs of the child;

(F) the role of the parent in the financial support of the child;

(G) the likelihood that the child will be adjudged a dependent minor under Section 2-4 [(705 ILCS 405/2-4 (West 2020))] and declared a ward of the court under Section 2-22 of the Juvenile Court Act of 1987 [(*id.* § 2-22)];

(H) the best interest of the child." *Id.*

¶ 205    According to the presentence investigation report, defendant is single and has four

children, one of whom is eight years old, two of whom are seven years old, and the fourth of whom is five years old. The presentence investigation report does not appear to specify where and with whom these children reside or who takes care of them, nor does defendant so specify in his brief. Defendant told the probation officer that before being incarcerated, he resided with his grandmother. It is unclear where the children resided, whether defendant had a "role *** in the day-to-day educational and medical needs of the child[ren]," and, if so, what the nature of that role was. *Id.* § 5-3-3.1(a)(18)(C). Also unclear was defendant's "role *** in the financial support of the child[ren]." *Id.* § 5-3-3.1(a)(18)(F).

¶ 206        Defendant told the probation officer that he had worked for the following employers:

"Getz Pressure Washing: Peoria, IL

SC2: Peoria, IL

OSF Cafeteria: Peoria, IL

Shinto Japanese Steakhouse: Naperville, IL

Charley's Cheesesteaks: Beaumont, TX."

The probation officer reported, however, "A request for employment data was sent to each of these locations and were returned reporting the defendant has never worked at any of these businesses."

¶ 207        Although, at the sentencing hearing, defendant's sister, Amber Isom, told the circuit court that defendant was "a provider for his family" and defendant's brother, Tyrese Solomon Gregory, likewise told the court that defendant was a "provider of his children," neither Isom nor Gregory explained how and to what extent defendant was a "provider." According to the presentence investigation report, defendant "has not worked and not been able to work due to

being incarcerated in the Peoria County Jail for the last two and half years," and he "has no assets to report."

¶ 208    When arguing to the circuit court that defendant had rehabilitative potential, defense counsel likewise characterized him as "a provider." But when the circuit court asked defense counsel to "define 'a provider,' " defense counsel answered, "Well, my client, you know, does—he took a very strong and active role in his—in his children's lives. He made—he made sure he was very—very active. He was very—very participatory in the—his children's lives." The court could reasonably regard such vague generalities as unpersuasive and could decide that the mitigating factor in section 5-5-3.1(a)(18)(F) was inapplicable or at least unsubstantiated.

¶ 209    4. *Rehabilitative Potential*

¶ 210    Defendant complains that the circuit court disregarded his rehabilitative potential. He represents that while in custody previously, he "obtained his GED, demonstrating his desire to better himself while incarcerated." At the page of the record he cites in this context, the presentence investigation report reads, "The defendant reported he obtained his GED while he was incarcerated in the Illinois Department of Corrections." The record, however, appears to lack a copy of a GED certification or diploma. Defendant's report that he obtained his GED could be discounted like his report that he worked for Getz Pressure Washing and SC2.

¶ 211    Defendant further represents that, "while on parole previously, [he] took advantage of the mental health services provided and was attending counseling." At the cited page of the record, the presentence investigation reports reads:

> "He reported the only mental health service he has ever participated in was when
> he was on parole with the Illinois Department of Corrections. He reported he was

very engaged with counseling services through Parole. A release for mental health records was sent to Pinckneyville and Statesville Correctional Centers. As of this date only disciplinary information from Pinckneyville has been returned and is attached to this report."

So, defendant's statement to the probation officer that he participated in mental health services while on parole appears to be unsubstantiated.

¶ 212 Defendant was 32 years old as of the date of the presentence investigation report, and he had accumulated five felony convictions. He committed the last two felonies while on pretrial release in a Class X felony case. He had little or no history of gainful employment, although he had four young children. The presentence investigation report assessed his risk of reoffending as high. We can see the logic of assessing his potential for rehabilitation as low.

¶ 213 In sum, then, we are unconvinced by defendant's argument that the evidence at the sentencing hearing was closely balanced. Consequently, he has failed to carry his burden under the plain-error doctrine, and the forfeiture of his sentencing issues must be given effect. See *Hillier*, 237 Ill. 2d at 545. Again, failure to establish prejudice under the first prong of the plain-error doctrine means failure to establish prejudice for purposes of a claim of ineffective assistance of counsel. See *Easley*, 192 Ill. 2d at 332.

¶ 214 III. CONCLUSION

¶ 215 For the foregoing reasons, we vacate the six-year sentence of imprisonment for aggravated reckless driving and impose, in its stead, a three-year sentence of imprisonment, and we otherwise affirm the circuit court's judgment.

¶ 216 Affirmed in part and vacated in part.